IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| GARRETT SCOTT VAIL,<br><br>            Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL<br>SECURITY,<br><br>         Defendant. | CASE NO. 1:25-cv-1203<br><br>DISTRICT JUDGE<br>PATRICIA A GAUGHAN<br><br>MAGISTRATE JUDGE<br>JAMES E. GRIMES JR.<br><br>**REPORT &<br>RECOMMENDATION** |

Plaintiff Garrett Scott Vail filed a Complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision denying disability insurance benefits. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). The Court referred this matter to a Magistrate Judge under Local Rule 72.2(b)(1) for the preparation of a Report and Recommendation. Following review, and for the reasons stated below, I recommend that the District Court vacate and remand the Commissioner's decision.

**Procedural history**

In May 2024, Vail filed an application for disability insurance benefits, alleging a disability onset date of April 2012, which he later amended to July

1, 2016.[1] Tr. 15.  In his application, Vail claimed disability due to "disabled veterans rated 100% permanent and total," sleep apnea, fibromyalgia, chronic sinusitis, social anxiety, restless leg syndrome, insomnia, prostatitis, carpal tunnel, knee tendonitis, high blood pressure and cholesterol, Raynaud's syndrome, GERD, allergic rhinitis, chronic fatigue, PTSD, "breath issues," and fatty liver.  Tr. 281.  The Social Security Administration denied Vail's application and his motion for reconsideration.  Tr. 58, 64.  Vail then requested a hearing before an Administrative Law Judge (ALJ).  Tr. 92.

In February 2025, an ALJ held a hearing, during which Vail and a vocational expert testified.  Tr. 30–57.  The next month, the ALJ issued a written decision finding that Vail was not disabled.  Tr. 15–24.  The ALJ's decision became final on April 9, 2025, when the Social Security Appeals Council declined further review.  Tr. 1–3; *see* 20 C.F.R. § 404.981.

Vail filed this action on June 6, 2025.  Doc. 1.  He asserts the following assignment of error:

> Whether the ALJ's residual functional capacity finding is unsupported by substantial evidence. Whether the ALJ erred … when failing to follow 20 C.F.R. §§ 404.1504, 404.1520c, and 404.1529 and SSR 16-3p.

Doc. 8, at 1.

---

[1]    "Once a finding of disability is made, the [agency] must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006).

2

**Evidence**

*Personal and vocational evidence*

Vail was 50 years old on his alleged onset date. Tr. 34, 177. He has a college education. Tr. 282. Vail served in the Air Force from 1984 to 1990, 2003 to 2005, and 2008 to 2010. Tr. 244.

*Medical evidence*

Vail "was medically retired with a pension from civil service in April 2012 secondary to fibromyalgia, sleep apnea and other health related issues." Tr. 1024. His date last insured[2] was December 31, 2018. Tr. 201. This means that Vail must show that he was disabled between July 2016 and December 2018.

*Evidence pre-dating the relevant period*

In October 2010, Vail was diagnosed with fibromyalgia, Tr. 372–73, for which he took Lyrica, Tr. 357.

In June 2011, while working as an Airfield manager in Colorado with the Air Force, Vail had an appointment at a Veterans Affairs (VA) clinic for obstructive sleep apnea and "maintenance insomnia" (waking up at night and being unable to return to sleep). Tr. 357. Due to his sleep problems, Vail had excessive daytime somnolence and difficulty concentrating at work. Tr. 357.

---

[2]    To be entitled to disability insurance benefits, a claimant must be a wage-earner who accumulated sufficient earning credits and became disabled before the end of his or her insured date. *See, e.g.*, 42 U.S.C. § 423(c)(1); *see also Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988); Soc. Sec. Disab. Claims Prac. & Proc. § 5:3 (2nd ed. 2022).

He had a CPAP machine[3], which he was only able to wear about three hours a night. Tr. 357. Medications (Lunesta, Ambien, Sonata, and Rozerem) had not helped. Tr. 357. Vail saw a behavioral medicine doctor, who helped him improve his sleep efficiency and fall asleep more easily, but Vail still woke up several times a night for unknown reasons. Tr. 357.

In January 2012, Vail saw Physician Assistant James Kuhn for a compensation and pension exam at a VA medical center in Ohio.[4] Tr. 1077–98. Kuhn's questionnaire stated that Vail had been diagnosed with fibromyalgia. Tr. 1091. He indicated that Vail exhibited tender or trigger points in the following areas: bilateral lower cervical region; bilateral occiput, trapezius muscle, and elbow. Tr. 1092–93. Kuhn stated that Vail's fibromyalgia did not affect his ability to work. Tr. 1093.

In January 2013, Vail saw John Smits, M.D., for a compensation and pension exam at a VA medical center in Colorado. Tr. 1029–64. Tr. 1030. Dr. Smits indicated that Vail had sleep apnea, fibromyalgia, chronic fatigue syndrome, musculoskeletal issues, and issues with his knee and lower leg. Tr. 1030–31. Regarding fibromyalgia, Vail exhibited tender or trigger points in the

---

[3]     A CPAP (continuous positive airway pressure) machine is a common treatment for sleep apnea. It keeps a person's airways open during sleep, ensuring that he or she receives oxygen. *See CPAP Machine*, Cleveland Clinic Health Library, https://my.clevelandclinic.org/health/treatments/22043-cpap-machine [https://perma.cc/H27A-GXZR].

[4]     A compensation and pension (C&P) exam is performed when a veteran files a VA disability claim. *See* https://www.va.gov/resources/va-claim-exam/ [https://perma.cc/PTV8-6E4V]

following areas: bilateral low cervical region, bilateral second rib, bilateral occiput, bilateral trapezius muscle, bilateral supraspinatus muscle, and bilateral elbows. Tr. 1035. Dr. Smits stated that fibromyalgia affected Vail's ability to work, and explained:

> The veteran reports that over the preceding year when he was working as an Airfield manager he lost approximately 1–2 days of work time every week due to fatigue. He reports that he also had difficulty doing the physical training activities which were required while in the military due to the fatigue and muscular pain. His wife works and he is a stay-at-home father, and he has not attempted to go back to work since his military discharge. He feels less stressed when he is not working, and he believes that this has helped his fibromyalgia condition.

Tr. 1037. Dr. Smits clarified that Vail did not have and had not been diagnosed with chronic fatigue syndrome. Tr. 1038. He wrote that in 2008 Vail had been diagnosed with left knee degenerative joint disease, Tr. 1041, and that he had sleep apnea, Tr. 1047. Dr. Smits wrote that Vail's sleep apnea affected his functioning in the following way: "The veteran reports that over the preceding year he lost approximately 1–2 days of work time every week due to fatigue." Tr. 1048.

The same day, Vail saw Donna Peters, Psy.D., for a mental compensation and pension exam for insomnia and chronic fatigue. Tr. 1018–19, 1023–28. Vail described his daily routine as follows:

> The Veteran wakes up at approximately 7 a.m. He will have coffee, do computer work, have breakfast and take his stepson to school. He will return home and clean, prepare meals[,] engage in yard work, and

> run errands to include grocery shopping. He will help
> his Stepson with homework and coaches his stepson's
> basketball team on most evenings. He sleeps between
> 10 and 10:30 p.m. He has 2 full meals per day. His
> interests include flying, golfing, fishing and coaching.

Tr. 1023–24. Vail's mental exam was normal and he scored a 30 out of 30 on a cognitive exam. Tr. 1024. Vail reported experiencing the following sleep symptoms most nights: taking about 60 to 90 minutes to fall asleep; waking up four to five times per night but able to return to sleep within minutes; and averaging sustained sleep for three to four hours per night. Tr. 1024. Vail didn't wear a CPAP mask because it made him anxious. Tr. 1024. Instead, to treat his sleep apnea, he used a dental apparatus. Tr. 1024. Vail had participated in three sleep studies and continued to have issues with sleep apnea. Tr. 1024. He reported extreme fatigue on wakening, which remained constant throughout the day. Tr. 1024. He napped during the day if needed. Tr. 1024. Vail reported low energy levels due to fatigue, and some difficulties completing tasks when he had an especially difficult time sleeping the night before. Tr. 1024. His sleep problems also worsened his physical health issues. Tr. 1024. Medications and other suggested treatments (sleep log, sleep-hygiene techniques) did not help. Tr. 1024.

Dr. Peters wrote that Vail "would have 1–2 missed days of work a week due to low energy levels." Tr. 1024. He "appear[ed] to have symptoms of primary insomnia." Tr. 1024. Dr. Peters diagnosed "likely" primary insomnia. Tr. 1024. The form asked about Vails "occupational and social impairment,"

and Dr. Peters selected the option that said: "Occupational and social impairment with occasional decrease in work efficiency and intermittent periods of inability to perform occupational tasks, although generally functioning satisfactorily, with normal routine behavior, self-care and conversation." Tr. 1026. When explaining Vail's occupational history, Dr. Peters reiterated Vail's reports that during the year 2012, he called off work one to two days per week due to fatigue. Tr. 1027. Dr. Peters described Vail's reports of past mental health treatment and said that he was not at that time seeing a mental health professional. Tr. 1027. Vail had previously sought treatment for sleep problems and tried Lunesta, Flexeril, Trazodone, Ambien, and Sonata, which had not helped. Tr. 1027.

In late February 2013, Dr. Peters provided an addendum, in which she was asked to "opine as to what portion of [Vail's] social and occupational impairment … is attributable to the Veteran's service connected sleep apnea and what portion is attributable to the Veteran's service connected primary insomnia." Tr. 1018. Dr. Peters answered that it was "not possible" for her to answer this question. Tr. 1018.

On January 31, 2013, the VA issued a decision on Vail's claim for service-connected compensation. Tr. 220. The VA determined that Vail's following impairments cause the following percentage-based disability rating: sleep apnea (50 percent); fibromyalgia (40 percent); and left knee (10 percent),

7

for a combined rating of 70 percent.[5] Tr. 222. On March 25, 2013, the VA added a primary insomnia impairment (30 percent) for a new combined rating of 80 percent. Tr. 230.

In May 2014, Vail saw Carolyn Welsh, M.D., and underwent a sleep study at a VA medical center in Colorado. Tr. 996. Vail reported that he had undergone a rhinoplasty (nose surgery) in August 2013 and that it had improved his sleep. Tr. 996. But he remained "intolerant" of CPAP therapy. Tr. 996. Dr. Welsh's impression of the study was that Vail's sleep apnea had not completely resolved, and that Vail's "AHI," the amount of times his breathing slowed or stopped during an hour of sleep, "remain[ed] in the severely elevated range." Tr. 996. She suggested that Vail try taking anxiety medication before using his CPAP machine (Vail had done this in the past) or use an "oral appliance" if he couldn't use a CPAP machine. Tr. 996. At a follow-up appointment in October, Vail reporting having trouble falling asleep. Tr. 987. He said that he was "doing well and feeling better on nights he use[d] the [CPAP] machine which isn't every night." Tr. 989. Dr. Welsh encouraged Vail to use the machine nightly and try cognitive behavioral therapy for his reported insomnia. Tr. 989.

---

[5]     The decision explains that the VA "do[es] not add the individual percentages of each condition to determine [the] combined rating. [It] use[s] a combined rating table that considers the effect from the most serious to the least serious conditions." Tr. 222.

In November 2014, Vail followed up with Dr. Welsh. Tr. 986. The week before, Vail had seen a psychologist for insomnia. Tr. 986–87. Vail told Dr. Welsh that he fell asleep quickly but still woke up during the night, which he attributed to his dislike of the CPAP mask. Tr. 986. Vail said that he would tear the mask off at night and that desensitization techniques had not helped. Tr. 986. Dr. Welsh wrote that Vail was resistant to trying deep-relaxation techniques, and that she wouldn't see Vail again unless he agreed to "engage in robust relaxation training." Tr. 986.

In May 2015, Vail visited a VA primary care clinic in Colorado. Tr. 975. He said that his insomnia was well-managed with Trazadone and his depression was well-controlled. Tr. 975. In September, Vail returned for a refill of his Cymbalta prescription to treat his fibromyalgia. Tr. 971. Vail's fibromyalgia was well-controlled on Cymbalta, he was "doing well," and he had no other concerns. Tr. 971.

*Evidence during the relevant period*

In May 2017, Vail saw nurse practitioner Lisa King at a VA primary care center in Ohio to establish care. Tr. 965. Vail complained of sleep apnea, fibromyalgia, and rhinitis (nasal inflammation). Tr. 965. He denied any musculoskeletal or neurological issues and said that his memory was "good." Tr. 965. Vail's physical exam was unremarkable: a full range of motion in his arms and legs; steady gait; no joint deformities, swelling, pain, or tenderness; and no muscle pain. Tr. 966. Vail reported that he no longer took Cymbalta,

Gabapentin, or Lyrica for his fibromyalgia and that his fibromyalgia was "stable." Tr. 966. For sleep apnea, Vail was "[n]on-compliant with CPAP." Tr. 966. He said that he had five prior sleep studies; had his uvula removed (the soft flap of tissue that hangs down at the back of the mouth), which had not helped; and declined a further evaluation at this visit. Tr. 966. For insomnia, Vail said that he tried behavioral training for sleep and reported that Trazadone worked the best. Tr. 966.

In May 2018, Vail saw Amy Schechter, M.D. for a fibromyalgia compensation and pension exam at a VA medical center in Ohio. Tr. 956–57. Dr. Schechter reviewed Vail's records and noted that he had been diagnosed with fibromyalgia in 2011. Tr. 956. She referenced Vail's past exams when asked to describe his history. Tr. 956. She listed Vail's symptoms: "[a]ches and pains … most severe in the shoulder area, sometimes in the lower back, and lesser throughout the rest of the body." Tr. 957. Vail still had "maintenance insomnia unrelated to the sleep apnea." Tr. 957. Dr. Schechter checked all of the boxes indicating Vail's signs and symptoms: widespread musculoskeletal pain, stiffness, muscle weakness, sleep disturbances, paresthesias, anxiety, and "Raynaud's-like symptoms."[6] Tr. 957. Vail had constant or nearly constant

---

[6]     Raynaud's syndrome is a disorder that affects the small blood vessels in fingers and toes, as well as nose, lips, or ear lobes. It causes episodic spasms of those small blood vessels, called a vasospastic attack, in response to cold temperatures or stress. These spasms cause the skin to turn white, then blue and feel cold or numb and, as the blood vessels relax, generally after about 15 minutes, the skin may turn red and feel tingly. *See* Raynaud's Syndrome, Cleveland                Clinic                Health                Library,

10

symptoms and pain in "all" trigger points bilaterally. Tr. 957. Dr. Schechter indicated that Vail's fibromyalgia affected his ability to work and explained: "The veteran was medically discharged after 28 years in the USAF due to his fibromyalgia and sleeplessness. It is more likely than not that his sleeplessness is a part of his fibromyalgia[.]" Tr. 957.

*Evidence after the relevant period*

At a May 2019 visit with a sleep psychologist at a VA clinic in Ohio, Vail said he had no difficulty falling asleep but had problems staying asleep. Tr. 2079–80. He estimated that during sleep he woke up three to five times "per week." Tr. 2080. He got about six hours of sleep a night, which he "realize[d] … is within normal limits." Tr. 2080. On exam, Vail was oriented, walked independently without an assistive device, had normal speech, a slightly anxious mood, congruent affect, logical and relevant thought content, fair insight and judgment, and no delusions or hallucinations. Tr. 2079. Vail reported that he was "very active." Tr. 2081. At the time of his visit, he was busy "cleaning out" his dad's estate. Tr. 2081. Vail maintained his home and was "always on the go." Tr. 2081.

In early 2023, Vail underwent carpal tunnel release surgery on both wrists. Tr. 734, 752–53.

---

https://my.clevelandclinic.org/health/diseases/9849-raynauds-phenomenon, [https://perma.cc/QF6G-VCPT].

A March 2024 MRI of Vail's cervical spine showed disc desiccation with mild disc bulging at multiple levels. Tr. 583.

On May 8, 2024, the VA added a bilateral restless leg syndrome impairment (20 percent each leg) for a new combined rating of 100 percent, effective November 8, 2023. Tr. 234.

Notes from a late May 2024 sleep medicine clinic at a VA clinic in Ohio state that Vail had moderate sleep apnea. Tr. 575. The doctor encouraged Vail to diet, exercise, and lose weight. Tr. 575. Vail was thinking about getting a CPAP machine, which the physician thought was "a good idea." Tr. 575.

In July 2024, Nurse Practitioner Lisa King wrote a letter for Vail's disability application. Tr. 1402. King wrote that Vail had been a patient at VA medical centers since 2011. Tr. 1402. He had been treated for fibromyalgia, insomnia, and sleep apnea "that has resulted in chronic fatigue." Tr. 1402. King said that Vail "has been unable to maintain employment since 2016 given these ailments." Tr. 1402.

At a November 2024 dermatology appointment, Vail had no areas of concerns with his skin and normal mental status findings. Tr. 1924. Vail said that he that he enjoyed yard work, and that he had a small farm and spent most of his days outside. Tr. 1924.

*State agency opinions*[7]

In June 2024, in relation to Vail's Social Security disability application, Gerald Kloyp reviewed Vail's record and determined that there was "insufficient information in file prior to [date last insured] to establish an RFC" (residual functional capacity).[8] Tr. 61. In August, Robert Klinger, M.D., reviewed Vail's record and agreed with Kloyp's finding. Tr. 67.

In June 2024, Katherine Fernandez, Psy.D., reviewed Vail's record and determined that there was insufficient evidence to establish a medically determinable mental impairment before Vail's date last insured. Tr. 61. In August 2024, Robyn Murry-Hoffman, Ph.D., reviewed Vail's record and agreed with Dr. Murry-Hoffman's finding. Tr. 67–68.

*Hearing testimony*

Vail testified during his administrative hearing before the ALJ. The ALJ summarized Vail's testimony at the administrative hearing as follows:

---

[7]     When a claimant applies for disability benefits, the State Agency creates a record. The record includes the claimant's medical evidence. A State Agency disability examiner and a State Agency physician or psychologist review the claimant's record and determine whether and to what extent the claimant's condition affects his or her ability to work. If the State Agency denies the claimant's application, the claimant can ask for reconsideration. On reconsideration, the State Agency updates the record and a second disability examiner and doctor review the file and make a new determination. *See, e.g.*, 20 C.F.R. § 404.1615.

[8]     An RFC is an "'assessment of'" a claimant's ability to work, taking his or her "limitations … into account." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002) (quoting 20 C.F.R. § 416.945). Essentially, it's the SSA's "description of what the claimant 'can and cannot do.'" *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir. 2004) (quoting *Howard*, 276 F.3d at 239).

the claimant testified that he is unable to work due to his impairments. He testified that he has been service-connected dating back to 2004. He testified that he has not worked since July of 2016. He testified to having fibromyalgia since his retirement from the military, which has resulted in brain fog, tenderness, and fatigue on a daily basis. He further testified that he is unable to sit or lie down for long periods in one position. The claimant indicated ongoing sleep problems, which his doctors are trying to figure out, as medication(s) have not helped much. He reported ongoing knee issues and problems going down stairs as well. He also testified to having issues with his hands after carpel tunnel surgery. Mentally, he indicated ongoing problems despite medications as well. He reported that his overall condition also affects his ability to remember and understand things, complete tasks, concentrate, follow instructions, and get along with others.

Tr. 20 (citing "Hearing testimony, Exs. 7E, 17E").

The ALJ discussed with the vocational expert Vail's past work as a recreation leader. Tr. 49–50. The ALJ asked the vocational expert to determine whether a hypothetical individual with Vail's age, education, and work experience could perform Vail's past work or any other work if the individual had the limitations assessed in the ALJ's RFC determination, described below. Tr. 50–51. The vocational expert answered that such an individual could not perform Vail's past work, but could perform the following jobs: routing clerk, merchandise marker, and mailroom clerk. Tr. 51–52.

14

**The ALJ's Decision**

The ALJ made the following findings of fact and conclusions of law:

1. The claimant last met the insured status requirements of the Social Security Act on December 31, 2018.

2. The claimant did not engage in substantial gainful activity during the period from his alleged onset date of April 15, 2012, through his date last insured of December 31, 2018 (20 CFR 404.1571 *et seq.*).

3. Through the date last insured, the claimant had the following severe impairments: osteoarthrosis, osteoarthritis, knee; fibromyalgia; insomnia; restless leg syndrome; anxiety and depressive disorder; and post-traumatic stress disorder (PTSD) (20 CFR 404.1520(c)).

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except the claimant cannot climb ladders, ropes, or scaffolds, but can occasionally climb ramps or stairs. He cannot balance as that term is defined in the Selected Characteristics of Occupations (SCO), but can occasionally stoop, crouch, kneel, and crawl. He cannot work at unprotected heights or work around hazardous machinery. He is also unable to perform commercial driving. The claimant can operate bilateral foot controls frequently. He can perform frequent reaching overhead, bilaterally. He can perform frequent handling and fingering. The claimant is also unable to have concentrated exposure to

extreme cold, heat, humidity, wetness, and pulmonary irritants. He can also have no concentrated exposure to vibration. Mentally, the claimant can perform simple, routine work, with only occasional interaction with the public, coworkers, and supervisors. He cannot perform fast-paced production such as assembly line or work where machine sets the pace; and work is of a variable rate. The claimant can perform only occasional decision-making and experience only occasional changes in the work setting. He is also unable to perform tandem routine job tasks with coworkers.

6. The claimant has no past relevant work (20 CFR 404.1565).

7. The claimant was … 52 years old, which is defined as an individual closely approaching advanced age, on the date last insured (20 CFR 404.1563).

8. The claimant has at least a high school education (20 CFR 404.1564).

9. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 404.1568).

10. Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569a).

11. The claimant was not under a disability, as defined in the Social Security Act, at any time from April 15, 2012, the alleged onset date, through December 31, 2018, the date last insured (20 CFR 404.1520(g)).

Tr. 17–23.

**Standard for Disability**

Eligibility for social security benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

An ALJ is required to follow a five-step sequential analysis to make a disability determination:

1. Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.

2. Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.

3. Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.

4. What is the claimant's residual functional capacity and can the claimant perform past relevant work? If so, the claimant is not disabled. If not, the ALJ proceeds to the next step.

5. Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work

17

> experience? If so, the claimant is not disabled.
> If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 416.920. *see Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 422 (6th Cir. 2008). Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Jordan*, 548 F.3d at 423. The burden shifts to the Commissioner at step five "to prove the availability of jobs in the national economy that the claimant is capable of performing." *Id.* "The claimant, however, retains the burden of proving her lack of residual functional capacity." *Id.* If a claimant satisfies each element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Walters Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

**Standard of review**

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Jordan*, 548 F.3d at 422. "'[S]ubstantial evidence' is a 'term of art'" under which "a court … asks whether" the "existing administrative record … contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (citations omitted). The substantial evidence standard "is not high." *Id.* at 103. Substantial evidence "is 'more than a mere scintilla'" but it "means only[] 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (citations omitted). The Commissioner's "findings … as to any fact if supported by

substantial evidence [are] conclusive." 42 U.S.C. § 405(g); *Biestek*, 587 U.S. at 99.

A court may "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice within which" the Commissioner can act, without fear of judicial "interference." *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 605 (6th Cir. 2009) (quoting *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994)).

**Discussion**

Vail argues that the ALJ erred when she failed to evaluate his treatment history: the records supporting the VA's disability assessment and the VA compensation and pension opinions in the record. Doc. 8, at 9–10. The Commissioner argues that the relevant period in this case is from 2016 to 2018, and that most of the records pre-date this period. Doc. 10, at 6. The Commissioner also asserts that none of the compensation and pension exams cited by Vail constitute a "medical opinion" that the ALJ was required to evaluate. *Id.* at 5.

The ALJ considered Vail's VA disability rating as follows:

> The disability ratings are not persuasive, as the VA uses different criteria to assess disability. (Ex. 1E). Nonetheless, they were considered in this decision. However, there is no indication during the relevant period to warrant a sedentary residual functional capacity or a more limiting residual functional capacity than found in this decision.

Tr. 22. This was not error, as the ALJ was not required to evaluate the VA's disability rating. *See* 20 C.F.R. § 404.1504 ("[the Agency] will not provide any analysis in our determination or decision about a decision made by any other governmental agency [such as the Department of Veterans Affairs] about whether you are disabled, blind, employable, or entitled to any benefits"). "However, [the Agency] will consider all of the supporting evidence underlying the other governmental agency … decision that [it] receive[s] as evidence in [a] claim." *Id.* So the ALJ was required to consider "all of the supporting evidence underlying" the VA's disability rating.

In her decision, the ALJ summarized Vail's medical evidence beginning in 2016. Tr. 21. But Vail's VA records go back to 2011, and the VA's compensation and pension exams that served as the basis for Vail's disability rating occurred in 2012, 2013, and 2018. The ALJ didn't discuss any evidence before 2016 and she didn't discuss Vail's 2018 compensation and pension exam, which occurred during the relevant period. It is true that an ALJ "need not discuss every piece of evidence in the record for [her] decision to stand," *Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 665 (6th Cir. 2004), and that

20

a duty to "consider" the evidence is different than a duty to "discuss" the evidence, *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006). It is also true, as the Commissioner says, that the relevant disability period in Vail's case runs from 2016 to 2018. Doc. 10, at 6. But the Commissioner hasn't cited legal authority that an ALJ is not required to consider evidence outside the relevant period—and the ALJ discussed evidence that post-dated the relevant period by six years. Tr. 22 (discussing 2024 treatment notes). So the ALJ's failure to discuss any records pre-dating the 2016 alleged onset date, and any compensation and pension exams which supported the VA's disability rating, is striking.

Regarding these compensation and pension exams, Vail argues that they contained "medical opinions" that the ALJ was required to evaluate. Doc. 8, at 10–11, 14–15. The Commissioner asserts that the compensation and pension exams did not contain *medical opinions*, so the ALJ wasn't required to evaluate them. Doc. 10, at 7.

The regulations define a "medical opinion" as "a statement from a medical source about what [claimants] can still do despite [their] impairment(s) and whether [they] have one or more impairment-related limitations or restrictions" in their ability to perform the physical, mental, or other demands of work. 20 C.F.R. § 404.1513(a)(2). Most of the compensation and pension exams did not contain *medical opinions*. For instance, Vail cites his 2013 compensation and pension exam form in which Dr. Smits was asked

21

to describe how Vail's fibromyalgia "impact[s] his ability to work."[9] Tr. 1037. Dr. Smits reiterated what Vail told him: that when performing past work Vail "lost approximately 1–2 days of work time every week due to fatigue"; he had difficulty performing his military work due to fatigue and muscle pain; and he felt less stressed since he stopped working, which has helped his fibromyalgia. Tr. 1037. Because they don't describe functional limitations that Dr. Smits believed Vail would have, these statements are not medical opinions. *See* 20 C.F.R. § 404.1513(a)(2); *see Francis v. Comm'r Soc. Sec. Admin.*, 414 F. App'x 802, 804 (6th Cir. 2011) (finding that a doctor's statement wasn't a "'medical opinion' at all—it merely regurgitates Francis's self-described symptoms"); *Harden v. Comm'r of Soc. Sec.*, No. 16-12394, 2017 WL 4946580, at *8 (E.D. Mich. Aug. 24, 2017) ("The medical source statement's mere parroting of plaintiff's reported symptoms and complaints (as dictated by plaintiff the very day the statement was completed) oppugns its status as an actual medical opinion under the regulatory definition").

Vail also cites Dr. Schechter's 2018 compensation and pension exam report, Doc. 8, at 17–18, but all Dr. Schechter's report contains is a summary of Vail's medical records and a statement that fibromyalgia affected Vail's work, Tr. 957. When Dr. Schechter was asked to describe *how* fibromyalgia affected Vail's work, she only wrote that Vail was medically discharged due to

---

[9] Dr. Smits's compensation and pension exam record, which spans 35 pages, is a questionnaire which includes check-the-box questions-and-answers and some imbedded narrative portions. Tr. 1029–64.

his fibromyalgia. Tr. 957. This is not a medical opinion. *See* 20 C.F.R. § 404.1513(a)(2).

Vail complains that the ALJ didn't evaluate the opinion of Nurse King, who in a July 2024 letter stated that Vail's fibromyalgia, insomnia, and sleep apnea cause chronic fatigue and that, as a result, Vail "has been unable to maintain employment since 2016." Doc. 8, at 16; Tr. 1402. But this doesn't describe any functional limitations, either. *See* 20 C.F.R. § 404.1513(a)(2). And to the extent King opines that Vail is unable to work, the ALJ is not required to evaluate such a statement because whether Vail is disabled or unable to work is an issue reserved to the Commissioner. *See* 20 C.F.R. § 404.1520b(c)(3)(i)–(viii) (listing the type of evidence that is "inherently neither valuable nor persuasive" such that the ALJ need not evaluate it, including whether a claimant is disabled, can perform work, or has a severe impairment).

Nevertheless, Vail has identified an opinion in the compensation and pension exam reports. In 2013, Dr. Peters indicated that Vail would have the following "occupational and social impairment": "occasional decrease in work efficiency and intermittent periods of inability to perform occupational tasks, although generally functioning satisfactorily, with normal routine behavior, self-care and conversation." Tr. 1026. This describes functional limitations and meets the basic threshold of an opinion.[10] As such, the ALJ was required to

---

[10] The Commissioner does not argue that the ALJ's failure to evaluate Dr. Peters's (or any other provider's) opinion is harmless error. So I haven't addressed this possibility. Other courts have disagreed as to whether the exact

evaluate it, or explain why she found it insufficient and not worthy of evaluation. *See* 20 C.F.R. § 404.1520c(b) (stating that the Agency "*will articulate* … how persuasive we find *all* of the medical opinions … in your case record.") (emphasis added); *see also Deamer v. Comm'r of Soc. Sec. Admin.*, No. 1:23-cv-2212, 2024 WL 2390286, at *11 (N.D. Ohio May 23, 2024) (under the updated regulations, an ALJ must articulate the persuasiveness of each medical opinion) (citing 20 C.F.R. § 404.1520c(b)) and *Hardy v. Comm'r of Soc. Sec.*, 554 F. Supp. 3d 900, 905 (E.D. Mich. 2021)). The ALJ's failure to evaluate Dr. Peters's opinion runs afoul of the regulations and therefore constitutes reversible error.

Vail also argues that the ALJ's evaluation of his subjective reports of symptoms was faulty. Doc. 8, at 25. He points out that the ALJ found that Vail's "statements regarding daily activities" were inconsistent with the medical evidence without ever citing any of Vail's daily activities. Doc. 8, at 25 (citing Tr. 22). This is true—nowhere in the decision does the ALJ describe any of Vail's daily activities. The Commissioner offers his view of Vail's inconsistent activities, Doc. 10, at 9, but this post-hoc rationale is insufficient to support the ALJ's decision. *See Hicks v. Comm'r of Soc. Sec.*, 909 F.3d 786, 808 (6th Cir.

---

language in Dr. Peters's report amounts to an *opinion* that the ALJ should have evaluated. *Compare, e.g., Shane H. v. Kijakazi*, No. 2:22-cv-593, 2023 WL 5724942, at *4 (D. Utah Sept. 1, 2023) (the same language found in Dr. Peters's report was not an opinion requiring evaluation), with *Hammad v. Kijakazi*, No. 4:20-cv-568, 2021 WL 3190808, at *9–10 (M.D. Pa. July 27, 2021) (the same language in Dr. Peters's report was an opinion requiring evaluation). Neither party cites these or other similar cases.

2018) ("[A]n agency's actions must be upheld, if at all, on the basis articulated by the agency itself, and not based on appellate counsel's post hoc rationalization[s]") (internal quotation marks and citations omitted). On remand, the ALJ will have an opportunity to re-evaluate Vail's allegations of symptoms, as well as all of the evidence of record.

**Conclusion**

For the reasons explained above, I recommend that the Court vacate and remand the Commissioner's decision.

Dated: December 29, 2025

*/s/ James E. Grimes Jr.*
James E. Grimes Jr.
U.S. Magistrate Judge

**OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530–31 (6th Cir. 2019).